IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CV-543-FL

| | |
|---|---|
| GREGORY LAHR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) ORDER |
| | ) |
| TCFI AEVEX LLC & TCFI AEVEX | ) |
| HOLDINGS LLC d/b/a Aevex Aerospace, | ) |
| | ) |
| Defendant.[1] | ) |

This matter is before the court on defendant's motion to dismiss for failure to state a claim. (DE 7). The motion has been briefed fully, and the issues raised are ripe for ruling. For the following reasons the motion is granted.

**STATEMENT OF THE CASE**

Plaintiff commenced this action in Cumberland County Superior Court on April 15, 2020, asserting wrongful discharge in violation of public policy against defendant, plaintiff's former employer.[2] Plaintiff seeks compensatory and punitive damages, as well as fees and costs.

---

[1] The court constructively has amended the caption of this order to reflect dismissal of former defendant Companion Security Group LLC ("CSG"), as set forth in more detail herein.

[2] Plaintiff also originally asserted his claim against former defendant CSG, which was an entity owned by defendant, as well as several individuals, Brian Raduenz ("Raduenz"), Robert Ferriol ("Ferriol"), and Edward Lake ("Lake"), who are employed by defendant. Plaintiff voluntarily dismissed former defendants Raduenz, Ferriol, and Lake, in state court on October 9, 2020. The court dismissed former defendant CSG on February 1, 2021, for failure to serve.

Defendant removed the action to this court, on October 12, 2020, on the basis of diversity jurisdiction. Defendant filed the instant motion to dismiss on October 19, 2020.[3] Plaintiff responded in opposition on December 17, 2020.[4] Defendant replied on December 29, 2020. On January 5, 2021, the court stayed scheduling conference activities pending decision on the instant motion.

## STATEMENT OF FACTS

The facts alleged in the complaint may be summarized as follows. Plaintiff was "the Vice President of Operations" for former defendant CSG, which is owned and controlled as a business unit of defendant. (Compl. ¶ 12). Plaintiff had worked for former defendant CSG since January 2017, and "helped said company, and later business unit of [defendant], grow from 80 employees to over 220 employees." (Id. ¶ 13). "Plaintiff was promoted, given raises, given bonuses and was generally praised for his work and his work ethic." (Id. ¶ 14).

In 2018, defendant and former defendant CSG "were 'capitalized by Trive Capital, which is a private equity firm that capitalizes growing companies, and then seeks to sell them to a profit to larger or different private equity firms." (Id. ¶ 15). In 2020, defendant and former defendant CSG were "actively trying to assist Trive Capital in selling the aforementioned Defendant companies so that huge profits and gains could be realized by various companies and individuals to include, inter alia, [former defendants] Raduenz . . . Ferriol and . . . Lake." (Id. ¶ 16).

---

[3] Defendant filed a motion to dismiss for failure to state a claim in state court on July 2, 2020, and a memorandum in support thereof, on September 16, 2020, which motion the state court denied on September 24, 2020, following a hearing. (See DE 1-1 at 50).

[4] The court granted plaintiff's motion to file a response out of time on December 11, 2020.

On February 3, 2020, plaintiff "noticed an irregularity within an 'Excel' spreadsheet that was being used as a 'New AOP[5] format' wherein $10,000.00 was added to the formula for each month as revenue being generated within the 'other direct costs' row within the 'Excel' spreadsheet." (Id. ¶ 17). "Plaintiff had no idea why said monetary amounts were added into the formula." (Id. ¶ 18). "Accordingly, he immediately went to go see the General Manager, Jason Link ['Link'], to question the phantom amounts of money." (Id.). [Link] did not have any information regarding the situation, and advised [plaintiff] to question [defendant's] Director of Finance, Dan LaRese ['LaRese']." (Id.).

Plaintiff questioned LaRese "regarding why non-existent monies were being reported on the new AOP's." (Id. ¶ 19). LaRese allegedly responded "it was to fluff the numbers so the CEO [Raduenz] and VP of Finance [Lake] could get the numbers where they needed to be for the on-going acquisition." (Id. ¶ 20). "This greatly alarmed [p]laintiff because it appeared that [defendant] and [former defendant] CSG were reporting false revenues on financial reports within the company so as to make them appear more profitable to the ownership team at Trive Capital, and to entice a new private equity firm to purchase the corporate Defendants." (Id. ¶ 21). "It appeared that the Defendants were 'cooking the books' to make themselves appear far more profitable than they were in reality." (Id.). "Plaintiff questioned other co-workers regarding these false and phantom monies, and no one within his physical office site had any knowledge of why said numbers were added to the AOP's other than the explanation given by [LaRese]." (Id. ¶ 22).

---

[5] The term or acronym "AOP" is neither defined nor spelled out in the complaint. Defendant offers an explanation in its memorandum in support of its motion, including reference to "Investopedia.com," (Def's Mem. (DE 8) at 3), which the court does not consider for purposes of the instant motion.

On February 19, 2020, plaintiff met with Link, LaRese, "the contracts manager and all five 'PM's' and two 'DPM's.'"[6] (Id. ¶ 23). In this meeting, LaRese allegedly "mentioned when he sends the AOP's to [Lake] and [Raduenz], they use a technique called 'smoothing' on the numbers to get them right." (Id.). "Plaintiff, in front of everyone within the meeting, then asked why a non-existent $10,000.00 was being added each month to the numbers." (Id. ¶ 24). LaRese then allegedly "told everyone that, 'it's to get the numbers where they need them for the acquisition.'" (Id.).

"In said meeting, [p]laintiff questioned the ethics and legality of said practice of 'smoothing' the numbers in conversation with [LaRese] in front of everyone." (Id. ¶ 25). "Plaintiff also stated that he wanted no part of 'smoothing' because said practice appeared fraudulent." (Id.). "Later that day, [p]laintiff was terminated for allegedly uttering an off-color remark that was allegedly first made by a co-worker regarding a female co-worker." (Id. ¶ 27). Plaintiff did not make nor repeat, or even recall, such a remark being made. Even if he had, other employees were not terminated for far worse alleged violations.

According to plaintiff, the reason given for his termination was "merely a pre-text," where he was instead "terminated for refusing to participate or otherwise condone 'smoothing' or 'fluffing' which is the practice of [Raduenz, Lake, and Ferriol] adding phantom monies to internal financial documents . . . to make the Defendant companies appear more profitable than they are in reality to entice private equity investment firms to purchase or invest in them which has resulted in huge profits for the Defendants." (Id. ¶ 29). According to plaintiff, "[t]he unethical and illegal conduct of the Defendants is often referred to as 'cooking the books,' and [plaintiff] refused to participate in such conduct and was terminated for said refusal." (Id. ¶ 30).

---

[6] The terms or acronyms "PM's" and "DPM's" are neither defined nor spelled out in the complaint.

"[T]he efforts of the Defendants to entice a new private equity firm were successful." (Id. ¶ 31). According to plaintiff, "Defendants successfully 'cooked the books' to entice two new private equity firms to purchase the Defendant Companies," and former defendants Raduenz, Lake and Ferriol "have reaped huge personal profits and ownership value increases as a result of their [allegedly] fraudulent conduct." (Id. ¶ 32).

**COURT'S DISCUSSION**

A.  Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (quotations omitted).

B.  Analysis

Defendant argues that plaintiff's complaint fails to state a claim for wrongful discharge in violation of public policy on three grounds: 1) plaintiff has not alleged a violation of a specific public policy of North Carolina, 2) there is no public policy against general 'whistleblowing' of an employee's subjective belief that an employer is behaving improperly, and 3) plaintiff has not alleged that he was encouraged or requested to break the law. The court agrees that the complaint

5

is insufficient on the third ground, and that dismissal is required with opportunity to file an amended complaint.[7]

As a general rule, "a contract of employment, even though it expressly refers to the employment as 'a regular, permanent job,' is terminable at the will of either party irrespective of the quality of performance by the other party." Still v. Lance, 279 N.C. 254, 259 (1971). "The narrow exceptions to [this rule] have been grounded in considerations of public policy designed either to prohibit status-based discrimination or to insure the integrity of the judicial process or the enforcement of the law." Kurtzman v. Applied Analytical Indus., Inc., 347 N.C. 329, 333–34 (1997). Under the public-policy exception to the at-will-employment rule, "while there may be a right to terminate a contract at will for no reason, or for an arbitrary or irrational reason, there can be no right to terminate such a contract for an unlawful reason or purpose that contravenes public policy." Coman v. Thomas Mfg. Co., 325 N.C. 172, 175 (1989) (quoting Sides v. Duke University, 74 N.C. App 331, 342 (1985)).

The North Carolina Supreme Court has "recognized a public-policy exception to the employment-at-will rule" in several contexts. Kurtzman, 347 N.C. at 331. In Amos v. Oakdale Knitting Co., 331 N.C. 348 (1992), the court held that discharging employees "for refusing to work for less than the statutory minimum wage" violated the public policy of North Carolina. Id. at 354. In Coman v. Thomas Mfg. Co., 325 N.C. 172 (1989), the court held that discharging an employee for refusing to falsify his driver records to show compliance with federal transportation regulations violates public policy. Id. at 176. There, the court also approved Sides, in which the court held

---

[7] Because dismissal is warranted on this ground, the court does not decide the motion on the other grounds asserted by defendant. Nevertheless, the court addresses several aspects of defendant's arguments on these other grounds in the analysis below.

that discharging an employee "for her refusal to withhold testimony or testify untruthfully in a lawsuit" violates public policy. 74 N.C. App. at 335.

By contrast, in <u>Kurtzman</u>, the court held that neither a public-policy exception nor any other exception to the employment-at-will rule applied to a plaintiff who had been discharged after moving from Massachusetts to North Carolina to accept a job based upon an employer's "assurances of continued employment." 347 N.C. at 334. The court reasoned, "[t]he facts here do not present policy concerns" justifying the public-policy exception to the employment-at-will rule. <u>Id.</u> Moreover, the court cautioned that "[a]dditional exceptions . . . demand careful consideration and should be adopted only with substantial justification grounded in compelling considerations of public policy." <u>Id.</u>

Likewise, in <u>Garner v. Rentenbach Constructors Inc.</u>, 350 N.C. 567, 572, 515 S.E.2d 438, 441 (1999), the court held that evidence that a defendant employer "violated [a] Controlled Substance Examination Regulation by failing to utilize an approved laboratory to conduct plaintiff's drug testing," the result of which was used to discharge the employee, was insufficient to support a public policy wrongful discharge claim. <u>Id.</u> at 572. In so holding, the court reasoned that "the termination itself must be motivated by an unlawful reason or purpose that is against public policy," and an employer may "terminate an employee for suspected drug use as part of an effort to maintain a drug-free workplace." <u>Id.</u> at 571-572.

Although the North Carolina Supreme Court has not delineated the outer contours of the public policy exception, the North Carolina Court of Appeals has opined that –

> [W]rongful discharge claims have been recognized in North Carolina where the employee was discharged (1) for refusing to violate the law at the employers [sic] request, see <u>Sides v. Duke University</u>, 74 N.C. App. 331 (2) for engaging in a legally protected activity, or (3) based on some activity by the employer contrary to law or public policy, see <u>Garner</u> [129 N.C. App. 624, 628 (1998)].

7

Ridenhour v. Int'l Bus. Machines Corp., 132 N.C. App. 563, 568–69 (1999). In Ridenhour, the court held that a plaintiff failed to establish a claim of wrongful discharge where, inter alia, there was "no indication [the plaintiff] was asked by his employer to violate any federal or state law or to perform any activity injurious to the public or against the public good." Id. at 569 (quotations omitted). Rather, the plaintiff "of his own accord, reported . . . fraudulent activity to" his employer. Id.

Similarly, in Considine v. Compass Grp. USA, Inc., 145 N.C. App. 314 (2001), the court held that the plaintiff failed to state a claim for wrongful discharge in violation of public policy where the plaintiff "discovered unlawful conduct on the part of the defendant which affected both federal, state and local government service contracts," plaintiff "advised his supervisor . . . regarding the conduct he had discovered," and was discharged shortly thereafter. Id. at 316. The court reasoned that no claim was stated where the "complaint does not allege that defendant's conduct violated any explicit statutory or constitutional provision, nor does it allege defendant encouraged plaintiff to violate any law that might result in potential harm to the public." Id. at 321.

By contrast, in Combs v. City Elec. Supply Co., 203 N.C. App. 75, 84–85 (2010), the court found the public-policy exception applicable where the plaintiff, who "oversaw the [defendant's] financial operations," was discharged after requesting that defendant refund customers who overpaid for electrical work. Id. at 77. In particular, "plaintiff's immediate supervisor, . . . told plaintiff not to send out negative account balance statements" to such customers. Id. at 84. In a meeting with another supervisor, plaintiff asserted that the defendant "was stealing money from its customers." Id. at 85. Shortly thereafter, plaintiff was discharged. Id. at 78.

A common thread running through the foregoing cases is that, to state a claim for wrongful discharge in violation of public policy for a refusal to act, a plaintiff must allege that he refused to violate the law at an employer's request or encouragement. Here, plaintiff does not allege sufficient facts to permit a plausible inference that defendant requested or encouraged plaintiff to take any unlawful act. While it is conceivable that plaintiff could allege facts, in addition to those already alleged, that would permit an inference of a request or encouragement to take such action, plaintiff has not done so. Rather, plaintiff alleges that he discovered allegedly unlawful conduct, raised this up with supervisors and co-workers, and then stated "that he wanted no part" of the alleged unlawful conduct. (Compl. ¶ 25).

Plaintiff suggests that it is enough that plaintiff "refused to participate in such conduct," or "otherwise condone" such conduct. (Compl. ¶¶ 29-30). This suggestion fails as a matter of law for two reasons. First, the case law cited above does not support a claim based upon the mere refusal to participate in or otherwise condone unlawful conduct by others. Sitting in diversity jurisdiction, this court is "called upon to predict how [the North Carolina Supreme Court] would rule if presented with the issue." Ellis v. Louisiana-Pac. Corp., 699 F.3d 778, 783 (4th Cir. 2012). Moreover, "a federal court should not create or expand a State's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (quotations omitted). "Absent a strong countervailing federal interest, the federal court . . . should not elbow its way into this controversy to render what may be an uncertain and ephemeral interpretation of state law." Id. (quotations omitted).

Plaintiff cites Johnson v. Friends of Weymouth, Inc., 120 N.C. App. 255 (1995), for the proposition that "[i]t is unlawful to terminate an employee for refusing to participate in unlawful conduct." (Pl's Resp. (DE 13) at 6). In Johnson, the plaintiff was discharged after she "encouraged

9

officers of defendant to return [insurance] proceeds to the insurance company," after items subject of a previous claim for loss had been found. Id. at 256. Plaintiff asserted that she was subject to wrongful discharge "because it was in retaliation for her refusal to cooperate and participate in Defendants['] unlawful conversion of the insurance proceeds." Id. at 257. The court of appeals held that the following issue should have been presented to the jury: "Was plaintiff's suggestion that insurance proceeds be returned to the insurance company a substantial factor in defendant's decision to terminate her employment?" Id. at 259.

The court declines to adopt Johnson as authority for the sweeping proposition that "refusing to participate in unlawful conduct," alone, can give rise to a claim for wrongful discharge in violation of public policy. In analyzing jury instructions in that case, the court did not cite any North Carolina Supreme Court law. See 120 N.C. App. at 256-260. Nor did the court discuss the standard for the public policy exception to the employment-at-will rule. See id. In this context, Johnson does not provide a valid basis for this court to give an expansive reading of the public policy exception.

Second, even if a "refusal to participate" can in some cases be sufficient to state a claim, plaintiff has not alleged sufficient facts here to nudge his claim from conceivable to plausible. Stating that he "refused to participate" (Compl. ¶¶ 29-30), is a conclusory statement, tracking what plaintiff asserts is an element of the claim. (See Pl's Opp. (DE 13) at 6). This statement is "devoid of further factual enhancement" that would enable the court to find a plausible claim for relief. Nemet Chevrolet, 591 F.3d at 255. For instance, plaintiff does not allege in what respect plaintiff's participation in the alleged unlawful conduct was expected or even possible. Plaintiff does not allege, for example, that his job duties encompassed creation or dissemination of the "AOP,"

referenced in the complaint. (See Compl. ¶¶ 17, 19). [8] Nor does plaintiff allege, for instance, that his position involved financial forecasting or evaluation of financial forecasting.

In this respect, plaintiff's allegations are in contrast to those in Combs, where the plaintiff had responsibility for oversight of defendant's "financial operations and his job duties included allocating the monies received by [defendant] to its various customer accounts," 203 N.C. Ap. at 75, and the plaintiff's supervisor expressly directed the plaintiff not to send out negative balance statements. Id. at 84. Similarly in contrast is Sides, where the plaintiff refused to follow instructions she thought were harmful to a patient, and where she was instructed to withhold testimony about treatment of the patient who died. 74 N.C. App. at 333. Likewise, in Coman, the employee was instructed to falsify his own driving logs. 325 N.C. at 173. Rather, plaintiff's allegations are more akin to those in Ridenhour or Considine, where the plaintiffs merely expressed concern with the conduct of others. 132 N.C. App at 778-779; 145 N.C. App. at 316, 321.

Accordingly, there is no basis upon which to conclude that the North Carolina Supreme Court would extend the "narrow exceptions" to the employment-at-will rule to circumstances presently alleged, where plaintiff was not requested or encouraged to take unlawful action. Kurtzman, 347 N.C. at 333. Thus, plaintiff's complaint must be dismissed for failure to state a claim for wrongful discharge in violation of public policy.

In so holding, the court notes one reason for not granting defendant's motion on the alternative grounds raised. In arguing that plaintiff has not alleged a violation of a specific public policy or any unlawful act, defendant draws inferences in its favor and introduces facts not alleged in the complaint. For example, defendant argues:

---

[8] Plaintiff suggests in his brief that he "refused to conspire along with the Defendants to defraud potential investors by creating and/or condoning, as Vice President of Operations, 'AOP's' with fictitious and false revenues." (Pl's Opp. (DE 13) at 8) (emphasis added). There is no allegation in the complaint, however, that defendant's position involved creation of "AOP's." (See, e.g., Compl. ¶¶ 17-26).

11

> Plaintiff alleges that he was told [defendant] "smoothed" the "numbers" on an internal financial <u>forecasting and revenue projection document</u>. Even if [defendant] did partake in what <u>Plaintiff erroneously refers to as "smoothing," "smoothing" is not per se unlawful. As noted on the popular website "Investopedia," "Income smoothing is not illegal if the process follows generally accepted accounting principles (GAAP). Talented accountants are able to adjust financial books in an above-board way to ensure the legality of income smoothing."</u> And, of course, Plaintiff <u>does not even allege that [defendant] committed fraudulent *accounting* practices</u> like in <u>Combs</u>. Plaintiff has merely alleged that [defendant] included a line item on an internal, <u>prospective financial forecasting document</u> which Plaintiff did not understand. Finally, unlike in <u>Combs</u>, Plaintiff <u>does not allege that [defendant] profited from its alleged "cooking the books" or "income smoothing."</u>

(Def's Mem. (DE 8) at 13-14) (emphasis added). None of the language emphasized in the quotation above is alleged in the complaint, nor is it an accurate representation of what is alleged in the complaint.[9] Rather, plaintiff alleges that the "AOP" spreadsheet, which was used "to entice private equity investment firms to purchase or invest" in defendant, included "phantom amounts of money," "non-existent monies," and "false and phantom monies." (Compl. ¶¶ 18, 22, 29). Plaintiff describes the practice as allegedly "reporting false revenues on financial reports within the company so as to make them appear more profitable to the ownership team at Trive Capital, and to entice a new private equity firm to purchase the corporate Defendants." (Id. ¶ 21). It is further described as "'smoothing' on the numbers to get them right," and "fluff[ing] the numbers," and allegedly "'cooking the books' to make themselves appear far more profitable than they were in reality." (Id. ¶¶ 20, 21, 23). These practices allegedly "resulted in huge profits for the Defendants." (Id. ¶ 29).

---

[9] Defendant also mischaracterizes the facts in <u>Combs</u>. According to defendant, the plaintiff in <u>Combs</u> "alleged that he was terminated for reporting that his employer City Electric Supply Company, <u>which provided electricity to the residents of Greensboro, North Carolina, stole money from the Greensboro residents by deleting residents' 'negative' accounts (credits to residents' accounts when the residents had overpaid for their energy services)</u>." (Def's Mem. (DE 8) at 12-13) (emphasis added). Combs did not involve residential customers, or services. Rather, the defendant provided electrical supplies to an "Entertainment and Sports Arena located in Raleigh," to "Turnage Corporation located in Morehead City," and "Wilbur's BBQ & Restaurant, Inc. located in Goldsboro." 203 N.C. App. at 81-82.

The characterization of the alleged unlawful conduct in the light most favorable to plaintiff is an important component of the analysis of both whether plaintiff has identified a public policy violation and an unlawful act. See, e.g., Considine, 145 N.C. App. at 321. Defendant, of course, may present evidence at a later juncture in the case explaining the asserted innocent nature of the alleged financial reporting practices. For present purposes, however, the court does not rest disposition of the instant motion on defendant's arguments premised, at least in part, upon defendant's view of the facts.

In sum, plaintiff's complaint must be dismissed for failure to allege that he was discharged for refusing to violate the law at defendant's request. Because dismissal is based upon insufficiency of factual allegations in the complaint, dismissal is without prejudice, and with leave to file an amended complaint within 28 days of the date of this order.

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss (DE 7) is GRANTED. Plaintiff's complaint is DISMISSED WITHOUT PREJUDICE for failure to state a claim upon which relief can be granted. Plaintiff is granted leave to file an amended complaint within 28 days of the date of this order. In the event plaintiff does not file an amended complaint within this time period, the clerk is DIRECTED, without further order of the court, to enter judgment for defendant on the basis of this order and close the case.

SO ORDERED, this the 30th day of April, 2021.

_____
LOUISE W. FLANAGAN
United States District Judge